**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Sarah N. Westcot (State Bar No. 264916)
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com
          swestcot@bursor.com

**BURSOR & FISHER, P.A**
Scott A. Bursor (State Bar No. 276006)
369 Lexington Avenue, 10th Floor
New York, NY 10017
Telephone: (212) 989-9113
Facsimile: (212) 989-9163
E-Mail: scott@bursor.com

*Attorneys for Plaintiffs*
*(additional counsel appears on signature page)*

FILED
CLERK, U.S. DISTRICT COURT
April 16, 2012
APR 16 2012
CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ILYA PODOBEDOV, JORDON MOUSSOUROS and RICHARD N. JAMES, On Behalf of Themselves and All Others Similarly Situated, | Case No. CV-11-6408 PSG (PLAx) |
| Plaintiffs, | Hon. Philip S. Gutierrez |
| v. | **FIRST AMENDED** <br> **CLASS ACTION COMPLAINT** |
| LIVING ESSENTIALS, LLC, INNOVATION VENTURES, LLC d/b/a LIVING ESSENTIALS, MANOJ BHARGAVA and BIOCLINICAL DEVELOPMENT, INC., | **JURY TRIAL DEMANDED** |
| Defendants. | |

RECEIVED
BUT
NOT FILED
APR 16 2012
CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

RECEIVED
CLERK, U.S. DISTRICT COURT
APR 16 2012
CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

ORIGINAL

FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs Ilya Podobedov, Jordon Moussouros and Richard N. James ("Plaintiffs") bring this action against Innovation Ventures, LLC ("Innovation Ventures"), its wholly owned subsidiary Living Essentials, LLC (collectively with Innovation Ventures, "Living Essentials," or the "Company"), Manoj Bhargava ("Bhargava"), and Bio Clinical Development, Inc. ("Bio Clinical," collectively with Living Essentials and Bhargava, "Defendants") on behalf of themselves and all others similarly situated. Plaintiffs make the following allegations upon information and belief, except as to allegations specifically pertaining to themselves, which are based on personal knowledge.

## **NATURE OF THE ACTION**

1.      This is a class action lawsuit on behalf of purchasers of 5-hour ENERGY® products, marketed by Defendants as a healthy dose of long lasting energy that "doesn't jack you up with sugar, caffeine, and herbal supplements." In reality, 5-hour ENERGY® products do not provide five hours of energy and Defendants admit that the product provides no caloric energy at all. Any feeling of increased energy or focus can be attributed solely to the product's highly concentrated dose of liquid caffeine.

2.      Defendants promoted their 5-hour ENERGY® products as containing "B-Vitamins for energy" and "amino acids for focus," leading consumers to believe that the product's healthy dose of B-vitamins and amino acids supply the increased energy. In reality, the jolt of alertness is actually the result of a concentrated dose of more than 200 milligrams of caffeine, *more than an extra strength caffeine pill.*

3.      Defendants utilize misleading marketing practices as a means of promoting a product with ingredients that do not perform as claimed. Defendants Manoj Bhargava and Living Essentials have received several warning letters from the Food and Drug Administration ("FDA") in connection with the advertising of their other three products which utilize similar marketing practices. Indeed, years before

1  Bhargava and Living Essentials launched 5-hour ENERGY®, the FDA informed them
2  that they could not get away with making prohibited claims incorporated in the name
3  of the product itself.

4      4.    To support their misleading claims, Defendants tout purported "clinical
5  studies," the results of which are presented to suggest that 5-hour ENERGY®
6  products act quickly as something other than a concentrated caffeine shot.

7      5.    The consensus of the medical and nutritional community is clear and
8  consistent: The massive dose of vitamins in 5-hour ENERGY® products are merely
9  flushed out of the consumers' system and provide no energy boost whatsoever.
10  Similarly, the other ingredients in 5-hour ENERGY® do not provide the product with
11  any of its short-term effects. It is all in the caffeine.

12      6.    Plaintiffs bring this action against Defendants in their individual
13  capacities for direct involvement in the dissemination of the misleading claims at
14  issue. In the alternative, this Complaint also asserts alter ego allegations against
15  Defendant Bhargava and his corporation Bio Clinical and seeks to pierce the
16  corporate veil of Living Essentials to reach these defendants.

17      7.    Plaintiffs assert claims on their own behalf and on behalf of a nationwide
18  class for violations of the Magnuson-Moss Act, 15 U.S.C. § 2301, *et. seq.*, and breach
19  of express and implied warranties.  Plaintiffs also assert claims on behalf of
20  subclasses under California law for violations of the California *Consumers Legal*
21  *Remedies Act* ("CLRA"), Civil Code §§ 1750, *et. seq.*, *Unfair Competition Law*
22  ("UCL"), *Business & Professions Code* §§ 17200 *et seq.*, and *False Advertising Law*
23  ("FAL"), *Business & Professions Code* §§ 17500 *et seq.*, and under New York law
24  for violations of that State's *Deceptive Trade Practices Act*, *General Business Law* §
25  349, *et seq.*

26
27
28

FIRST AMENDED CLASS ACTION COMPLAINT                                           2

## PARTIES

8.     Plaintiff Ilya Podobedov ("Podobedov") is a citizen of New York who resides in Brooklyn, New York.   On various occasions in the last four years, Podobedov purchased and consumed 5-hour ENERGY® products from retail stores in the States of New York, Nevada and California.

9.     Plaintiff Jordon Moussouros ("Moussouros") is a citizen of New York who resides in Westchester, New York.   On various occasions in the last four years, Moussouros purchased and consumed 5-hour ENERGY® products from retail stores in the State of New York.

10.     Plaintiff Richard N. James ("James") is a citizen of California who resides in Sylmar, California.   On various occasions in the last four years, James purchased and consumed 5-hour ENERGY® products including both individual bottles and multipacks of 5-hour ENERGY® from retail stores in the State of California.

11.     Defendant Innovation Ventures is a Michigan limited liability company with its principal place of business in Farmington Hills, Michigan.   Innovation Ventures, formed in July 2000 by Defendant Bhargava, has sold a number of products including the dietary supplement 5-hour ENERGY® and a line of "hangover prevention" products under the Chaser® brand name alternatively marketed as dietary supplements or homeopathic remedies (the "Chaser Products").[1]   The members of Innovation Ventures are citizens and residents of one of the following states: Michigan, Indiana or California.   At all relevant times, Innovation Ventures has done substantial business in the State of California.

12.     Defendant Living Essentials is a Michigan limited liability company and wholly owned subsidiary of Innovation Ventures founded in 2008 with its principal

---

[1]     After this Action was commenced, Defendants discontinued sale of the Chaser Products.

FIRST AMENDED CLASS ACTION COMPLAINT

1   place of business in Farmington Hills, Michigan.  At all relevant times, Defendant has
2   done substantial business in the State of California.

3       13.    Defendant Bhargava, a resident of Michigan. is a board member and
4   Chief Executive Officer of Innovation Ventures.  He also owns 79% of Living
5   Essentials (including 30% owned through a closely held company) and is the sole
6   owner of Defendant Bio Clinical.  Defendant Bhargava created Chaser® in 2000,
7   Chaser® for Wine Headaches in 2001, Chaser® Plus in 2004 and 5-hour ENERGY®
8   later that year.  Bhargava is the inventor of 5-hour ENERGY® products and assigned
9   the patents for the formulas for the caffeinated and decaffeinated varieties of the
10  product to Bio Clinical.  Defendant Bhargava makes personal appearances throughout
11  the United States including the State of California.

12      14.    Defendant Bio Clinical Development is a Michigan corporation with its
13  principal place of business in Farmington Hills, Michigan.  Defendant Bhargava is
14  the sole owner of Bio Clinical and its sole employee.  Bio Clinical holds the patent to
15  the formulas for caffeinated and decaffeinated varieties of 5-hour ENERGY®
16  products.

17      15.    At all relevant times, each of the Defendants were engaged in the design,
18  manufacture, production, testing, study, inspection, mixture, labeling, marketing,
19  advertising, sale, promotion and/or distribution of 5-hour ENERGY® products.

20      16.    At all relevant times, Defendant Bhargava has been operating Bio
21  Clinical and Living Essentials as his alter egos or vice versa and as a single business
22  enterprise.

23      17.    At all relevant times, each Defendant acted in concert with, with the
24  knowledge and approval of and/or as the agent of the other defendants within the
25  course and scope of the agency, regarding the acts and omissions alleged.

26
27
28

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question).  This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

19.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, and Plaintiffs, as well as most members of the proposed class, are citizens of states different from Defendants.

20.     This  Court  has  personal  jurisdiction  over  Defendants  because Defendants conduct substantial business in the State of California through Living Essentials, such that they have significant, pervasive and substantial contacts with the State of California.

21.     Venue is proper in this Court under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claim occurred within this District and because the Defendants are subject to personal jurisdiction in this district.

## Facts Common to All Causes of Action

### False and Misleading Marketing of 5-Hour Energy

22.     In 2004, Defendants launched 5-hour ENERGY®, the first ever "energy shot,"[2] into the highly competitive energy drink market.  5-hour ENERGY® products are 1.93 – 2 ounce "energy shots" marketed as dietary supplements.

23.     5-hour ENERGY® products are sold in retail stores across the country for approximately $2.99 per shot (the suggested retail price).  They are also sold in 4, 6, and 12-pack multipack versions for approximately $11.99, $14.99 and $25.99

---

[2]     An "energy shot" is an energy drink concentrated into a two-three ounce bottle.

1 | respectively.[3]  The Company's website, in addition to numerous retailers, sell only
2 | multipacks and will not sell individual bottles of 5-hour ENERGY®.

3 |     24.    Additionally, the products come in a number of fruit flavors, and
4 | regular, extra strength and decaffeinated varieties.

5 |     25.    In 2011 alone, sales of 5-hour ENERGY® products accounted for
6 | approximately one billion dollars in net sales.  Their sales accounted for more than
7 | 90% of the energy shot market and the Company boasts that it sells more than nine
8 | million bottles per week.

9 |     26.    To maintain its large market share, Living Essentials spends
10 | approximately $90 million annually on a massive and ubiquitous marketing and
11 | advertising campaign including television and radio commercials, internet websites,
12 | print media, event promotion and celebrity endorsements.  The product's success can
13 | be attributed to a large extent to the representations in this media campaign.

14 |   ***"5 Hours of Energy"***

15 |     27.    Defendants' false advertising begins with
16 | the product's name: 5-hour ENERGY®.

17 |     28.    Defendants' representation in the product
18 | name is no less descriptive and explicit than the claim on
19 | the bottle when the product was first launched.  The
20 | original packaging promised consumers: "5 hours of
21 | energy now."



22 |     29.    Defendants later changed the packaging to
23 | read "Hours of energy now," but kept the same
24 | misleading representation in the product name.

25 |     30.    5-hour ENERGY® does not provide
26 | consumers with five hours of energy.

27 | [3]  *See e.g.*, http://www.shop5hourenergy.com/detail/5HR+BERRY+6 (last accessed
28 | April 14, 2012).

31.     It provides no energy at all.  Indeed, in the Company's most recent 30-second television commercials, it admits in a brief, fine print, written disclaimer that 5-hour ENERGY® "does not provide caloric energy."  Nor does it provide any other form of energy.

### *5-hour ENERGY®'s Claim of "Beneficial Ingredients"*

32.     Defendants claim that the product is effective in creating a "feeling" of increased energy, alertness and focus.  Defendants, however, falsely and misleadingly attribute this effect to the product's "beneficial ingredients," including B-vitamins and amino acids.  The only ingredient that has any effect is the concentrated dose of caffeine, a psychoactive stimulant.

33.     The regular and extra strength varieties of 5-hour ENERGY® are liquid caffeine shots with a liquid multivitamin including mega-doses of certain B-vitamins, amino acids and enzymes.  The product label indicates that a 1.93 oz. bottle of regular strength 5-hour ENERGY® includes large doses of the following B-vitamins: Vitamin B12, Vitamin B6; folic acid (Vitamin B9) and Niacin (Vitamin B3):

**5-hour ENERGY®**
**Original**



## Supplement Facts
Serving Size 1.93 fl. oz.

| Amount Per Serving | % Daily Value |
|---|---|
| Niacin (as Niacinamide) 30mg | 150% |
| Vitamin B6 (as Pyridoxine Hydrochloride) 40mg | 2000% |
| Folic Acid 400mcg | 100% |
| Vitamin B12 (as Cyanocobalamin) 500mcg | 8333% |
| Sodium 18mg | <1% |
| Energy Blend 1870mg | ‡ |
| Taurine, Glucuronic acid (as or from glucuronolactone), Malic Acid, N-Acetyl L-Tyrosine, L-Phenylalanine, Caffeine, Citicoline | |

‡Daily value not established.

Other Ingredients: Purified Water; Natural and Artificial Flavors; Sucralose; Potassium Sorbate, Sodium Benzoate and EDTA (to protect freshness).

Similar megadoses of liquid B-vitamins can be purchased for less than $0.10 per dose.

34.     While consumers may generally be aware of the effects of caffeine, the marketing and advertising for 5-hour ENERGY® products falsely represent and overemphasize the effects of its "beneficial ingredients" other than caffeine while deemphasizing the effect of caffeine.   For example, during the class period, the marketing and advertising claims for 5-hour ENERGY® have included the following representations:

- A powerful blend of B Vitamins for energy.

- 5-hour ENERGY®'s blend of vitamins and amino acids gives you hours of smooth energy.

- 5-hour ENERGY® doesn't jack you up with sugar, caffeine and herbal stimulants. Instead, it's packed with stuff that's good for you – B-vitamins, amino acids and enzymes.

- 5-hour ENERGY® is made from a healthy blend of B-vitamins and amino acids that'll wake you up fast and keep you going strong for hours - with no crash. 5-hour ENERGY® is made without sugar and with very little caffeine - so you get real get up and go that lasts.

- 5-hour ENERGY® drinks provides a boost of energy and mental alertness that lasts for hours – with no crash.  That's because 5-hour ENERGY® is packed with B-Vitamins, enzymes and amino acids. It contains zero sugar, zero net carbs, and just enough caffeine to get the ball rolling.

- The key ingredients in 5-hour ENERGY® are also available in every day foods – like broccoli, avocados, bananas and apples – or already in you.

1    It contains zero sugar, four calories and as much caffeine as a cup of the

2    leading premium coffee.

3    35.   Not only do Defendants' deemphasize the effects of caffeine, they mask

4    the products true caffeine content.   For example, the Company discloses that the

5    regular strength variety of 5-hour ENERGY® contains as much caffeine as a cup of

6    premium coffee (four times as much caffeine by volume), while the extra strength

7    variety contains as much as a twelve ounce cup of premium coffee (six times as much

8    caffeine by volume).   The Company, however, has refused to disclose the actual

9    amount of caffeine in the product.   In fact, an independent chemical analysis revealed

10   that a single two-ounce bottle of regular strength 5-hour ENERGY® contains 207

11   milligrams of caffeine.

12   36.   By way of comparison, extra strength caffeine pills, which have been on

13   the market for decades, contain only 200 milligrams of caffeine.   They can be

14   purchased for $6.49 for a 100-pill bottle or less than 6.5 cents per pill.

15   37.   One of the Company's commercials, which was removed from its

16   Youtube.com page after the initial Complaint in this Action was filed, features a

17   bottle of 5-hour ENERGY® and a high performance stock car speeding down a

18   racetrack above text that reads: "B-Vitamins for energy.   Amino acids for focus."



38.     Another commercial reads: *"B-Vitamins for Energy.  Amino Acids Focus & Better Mood.  Enzymes Feel it Faster,"* while an off-screen narrator says:

> *With 5-hour ENERGY® you can leave grogginess behind and sail through your day without feeling jittery, tense, or, you know.  That's because 5-hour ENERGY® contains a powerful blend of B vitamins for energy, amino acids for focus and better mood, and enzymes to help you feel it faster. There's zero sugar, about as much caffeine as a cup of coffee and only 8 calories.*

39.     Moreover,   Defendants   have targeted senior citizens with ads featuring celebrity senior John Ratzenberger carrying a bicycle over his shoulder (annexed hereto as Exhibit A) reads:

**AARP Special MEMBER OFFER**

Getting older is fine, but not having the energy to do the things I enjoy isn't.  That's why I take 5-hour ENERGY®.  It gives me hours of energy to keep on doing the things I love to do.  What do you love to do?  Dancing? Golf? Gardening? Whatever it is 5-hour ENERGY® can give you the energy you need.  There's a lot to like about 5-hour ENERGY® Zero sugar. Four calories.  It's a nutritional supplement that really works.  Vitamin B12, vitamin B6, vitamin B3, amino acids and more.  Caffeine comparable to a cup of the leading premium coffee.  Also available in Decaf version.

40.     To the extent that the preceding statements claim that ingredients other than caffeine provide consumers with increased energy and focus, those statements are false and deceptive.  To the extent the statements suggest the same, they are calculated to mislead consumers into believing the false premise that consumers who

1    use 5-hour ENERGY® will receive short term benefits from the B-vitamins and

2    amino acids in the product.

3    ### *Decaffeinated 5-hour ENERGY®*

4    41.    Defendants also market a decaffeinated variety of 5-Hour ENERGY®,

5    ("5-Hour ENERGY® Decaf") which is touted as providing "hours of alertness and

6    focus without making you feel jittery."

7    42.    The decaffeinated variety of 5-Hour ENERGY® , however, includes only

8    a small amount of caffeine, and none of the so-called "beneficial ingredients" provide

9    a feeling of increased energy.

10    43.    5-hour ENERGY® Decaf contains a megadose of B-vitamins and amino

11    acids, but only six milligrams of caffeine, less than one-thirtieth the amount of

12    caffeine in the regular caffeinated variety and according to Defendants, equivalent to

13    half a cup of decaffeinated coffee.

14    44.    Like the other 5-hour

15    ENERGY® varieties, Defendants claim

16    these benefits derive from the so-called

17    "beneficial ingredients" in the product.

18    For example, Defendants claim: "Decaf 5-

19    Hour Energy contains B-vitamins for

20    energy and amino acids for focus."



21    45.    The decaffeinated variety of

22    5-hour ENERGY® provides no feeling of

23    increased energy at all. It is merely a

24    placebo.

25    ### The Questionable Claims and Uses of Defendants' "Clinical Studies"

26    46.    To add the appearance of legitimacy and support to their claims

27    regarding the product's efficacy, Defendants have touted phony clinical studies which

28

FIRST AMENDED CLASS ACTION COMPLAINT        11

1  misleadingly present results in a manner that suggests 5-hour ENERGY® products act
2  quickly as something other than a concentrated caffeine shot.

3  ### *The Competing Products Study*

4      47.    After several years of making unsubstantiated claims that the products
5  provide 5 hours of energy, the National Advertising Division ("NAD") of the Better
6  Business Bureau conducted an investigation of Defendants' advertising claims for 5-
7  hour ENERGY® products.

8      48.    In response to the investigation, Living Essentials commissioned a
9  clinical study in 2007 to compare the effects of 5-hour ENERGY® to two competing
10 products (the "Competing Products Study").

11     *The Results Refute Defendants' Advertising Claims*

12     49.    The Company summarized the results of the Competing Products Study
13 in the following chart which is published on its website:



50.    There is no set of data that could be both consistent with Defendants'
claims about 5-hour ENERGY® and the representations on the chart.  First, the chart
indicated that only 60% of 5-hour ENERGY® products provided five or more hours
of energy.  Such a low score is inconsistent with the product's name.  Second, the
chart also shows that approximately 25% of 5-hour ENERGY® products caused a

---

FIRST AMENDED CLASS ACTION COMPLAINT            12

subjects that completed Dr. Blum's NuHair clinical trial reported hair loss improvement; and

- Vitexxa™ – a revolutionary weight loss accelerator. According to the reported results of this study, 100% of the subjects using Vitexxa lost weight.

### The Phony Medical School

54.    Innovation Ventures hired an expert to defend the competing products study. The expert claimed that Dr. Blum was an Epidemiologist and Biostatistician at the University of New England Medical School. This is false. The University of New England does not have a medical school.

55.    Innovation Ventures' hired expert further claimed that the University of New England Medical School's Institutional Review Board ("IRB") approved the Competing Products Study. The Chairman of the University's IRB, however, maintains that his Board never approved such a study.

### The Purported Research Center

56.    Innovation Ventures' hired expert also claimed that the Competing Products Study was conducted at the Southern Maine Research Center, an independent medical research center, located at 344 Cumberland Street, Westbrook, Maine. In fact, that is the address of a private proctologist's office. It is not a medical research facility. A sign at the address reads in large type: Maine Proctology Center, Richard Stockwell, D.O. and in smaller type below reads: Southern Maine Research Center.

### **The Second Study**

57.    The second study which is currently being touted by the Company is promoted in a way that misleads consumers about the ability of the product's ingredients, other than caffeine, to provide a feeling of increased energy. In this purported clinical study, the Company claims that 5-Hour Energy® "significantly outperformed placebo on continuity of attention and self-related awareness." It is not

1    surprising that positive results would be obtained when comparing an inert placebo to
2    the concentrated caffeine shot that is 5-hour Energy®.

3        58.    This study is not subject to review because it is unpublished.    The
4    Company has also refused to provide media and consumer groups with a copy of the
5    study.

6        59.    The Company has devised a scheme to use the quite predictable results
7    of the placebo study to bolster its misleading claims concerning the immediate energy
8    producing benefits of its ingredients other than caffeine.    The placebo study is
9    presented to consumers on the Company's 5-hour ENERGY® website listing the
10   product's ingredients.[4]    Immediately after touting the results of the placebo study, the
11   Company discusses the relation of its ingredients to energy production and alertness,
12   falsely suggesting that the effects of each of those ingredients contributed to the
13   study's positive results.    Though the high concentration of caffeine is wholly
14   responsible for the results of the placebo study, caffeine is the last of the eleven
15   ingredients described.  The description of the remaining ten ingredients, when taken
16   with the representations above, is designed to mislead consumers into thinking that
17   those ingredients have an immediate noticeable effect on consumers of 5-hour
18   ENERGY®. The website reads, in part:[5]

> In a clinical trial 5-hour ENERGY® significantly outperformed placebo
> on continuity of attention and self-related awareness. But what's in it? A
> brief description of each ingredient follows. …
>
>   • Vitamin B6. … It's involved in over 100 crucial chemical reactions in
>     our bodies.  It helps form nearly all new cells in our bodies.…

---

[4]  *See* Exhibit. B, 5-hour ENERGY® Ingredients & Safety webpage located at
http://www.5hourenergy.com/ingredients.asp (last accessed August 3, 2011).
[5]  *Id.*

- Vitamin B12 is involved in a variety of important functions including the production of amino acids and the ***processing of carbohydrates into energy***.
- Niacin is important for energy production. It plays a key role in ***converting fats, proteins, carbohydrates and starches into usable energy***....
- Folic acid, or folate, helps produce and maintain new cells in our bodies…
- Citicoline is a water-soluble compound essential for the synthesis of phosphatidyl choline, a constituent of brain tissue. Citicoline plays a role in neurotransmission and ***can help support brain function***....
- Tyrosine. An amino acid that ***transmits nerve impulses to the brain***....
- Phenylalanine. An essential amino acid that ***enhances alertness***....
- Taurine … It plays a role in digestion, and is used to process potassium, calcium and sodium in the body, as well as maintain the integrity of cell membranes.
- Malic Acid. The body synthesizes Malic Acid during the process of ***converting carbohydrates to energy***....
- Glucuronolactone. A natural metabolite found in the human body. It is produced by the metabolization of glucose in the liver. ***It has been shown to reduce sleepiness***.

- Caffeine. Provides a boost of energy and feeling of heightened alertness.

(emphasis added).

## Medical Experts Maintain That Defendants' Claims Are False and Misleading

60.    Medical and nutritional experts across the country have challenged Defendants' claims that 5-hour ENERGY® is anything more than a concentrated caffeine shot.

61. A spokesperson for the product recently told CBS news that "the amount of B-vitamins [in the product] are essential for the energy metabolism and for boosting the furnace or the powerhouse of the cell to provide energy." But that claim cannot withstand scrutiny.

62. Dr. Hope Bakoukis, Ph.D., Associate Professor of Nutrition at Case Western Reserve University and Chairwoman of the Sports Cardiovascular and Wellness Nutritionists practice group of the American Dietetic Association has described the Company's claims as "brilliant marketing, but it doesn't have any basis." She notes that although B-vitamins are responsible for the production of energy, just about everyone in the United States receives all of the B-vitamins that they could possibly need from their diets. Extra B-vitamins are merely flushed out of the system. She notes that "[w]eary office workers can't expect to get a jolt from B vitamins in any form."

63. Dr. Marion Nestle, Ph.D., Professor of Nutrition, Food Studies, and Public Health at New York University, echoed the misleading nature of Defendants' claims by stating:

It sounds like a great placebo to me. You can gulp this down and you feel like you're doing something. And I'll bet you ask people and they say they feel better. It's got caffeine — why not?

64. Similarly, Dr. Victoria J. Drake, Ph.D., Director of the Micronutrient Information Center at the Linus Pauling Institute of Oregon State University, has stated that "for typical consumers of energy supplements or drinks, B vitamins are nothing more than a gimmick."

65. Experts working with senior citizen populations have expressed particular outrage with the way the Company markets its product to that vulnerable demographic.

66. The Company targets seniors in its advertising, and promotional materials. In addition to the Ratzenberger advertisement referenced above, the Company's website offers discounts to members of the American Association of Retired Persons ("AARP"). The webpage includes the following warning for seniors: "Check with your doctor before taking 5-Hour Energy® if you are taking prescription medicines or have a medical condition." However, Defendant Bhargava and other company staffers handed out thousands of samples of 5-hour Energy® products to seniors at the AARP's annual conference, about which Bhargava's commented: "It was amazing to see the number of people who took it right there and then."

67. One critic of the Defendants' senior citizen marketing practices is Colin Milner, Chief Executive Officer of the International Council on Active Aging. He says the key to having more energy as an older adult is to eat right and to exercise, not to down some magic elixir. Furthermore, energy shots merely "give you a big caffeine rush and away you go."

68. Similarly, Dr. Evelyn Granieri, Chief of Geriatric Medicine and Aging at Columbia University College of Physicians and Surgeons noted that "[m]edically and physiologically" Defendants' claims don't "hold water."

**Alter Ego Allegations**

69. Bhargava established Living Essentials for an illegal purpose: to perpetrate fraud. 5-hour ENERGY® is Bhargava's and the Company's fourth product to utilize misleading marketing practices as a means of promoting a product with ingredients that do not perform as claimed. Bhargava and Living Essentials have honed their marketing tactics over time, drawing upon their prior experience of using similarly deceptive marketing tactics in earlier products such as creating phony clinical studies, making false representations in the product name, and attributing the effects of the primary ingredient to lesser ineffective ingredients. Bhargava and

1  Living Essentials then employed this entire arsenal of false marketing and advertising
2  tricks to sell their most successful product 5-hour Energy®.

3      70.    Defendants abused the corporate form to accomplish fraudulent objects,
4  namely, to fraudulently promote the sale of their products, to conceal the proceeds of
5  those frauds and frustrate the ability of victims to obtain redress for the fraud.

6  ***Living Essentials Was Established and Continues To Operate For a Fraudulent***
7  ***Purpose***

8      71.    To date, the Company has launched four products: Chaser®, Chaser for
9  Wine Hangovers®, Chaser Plus® and 5-hour ENERGY®. The Company engaged in
10 fraud with respect to each of these products. The fraudulent schemes concerning
11 Chaser® products appear to be dress rehearsals for the main event that is the 5-hour
12 ENERGY® hoax, as each fraudulent scheme bears many similarities to this case.

13         ***Product 1: Chaser®***

14     72.    In 2000, Defendant Innovation Ventures, LLC launched its first product,
15 Chaser®, a purported dietary supplement for the treatment of hangovers, and claimed
16 that the product could "help prevent hangovers" and "help prevent hangovers by
17 absorbing elements in beer wine and liquor that cause hangovers."

18     73.    On March 30, 2001, the FDA wrote to Defendant Bhargava and the
19 Company informing them that their claims for the product do not meet FDA
20 requirements for dietary supplements and determined that the claims suggest that the
21 product be treated as a drug for the treatment of a disease rather than a dietary
22 supplement.[6] The letter reads in part:

23     Your submission states that Living Essentials is making the following
24     claims, among others, for the product Chaser:

25

26     "Helps prevent hangovers"

27

---

28 [6]  *See* Exhibit C, FDA letter to Manoj Bhargava, dated March 30, 2001.

FIRST AMENDED CLASS ACTION COMPLAINT              19

"Helps prevent hangovers by absorbing elements in beer, wine and liquor that cause hangovers"

… The statements that you are making for this product suggests that it is intended to treat, prevent, mitigate a disease, namely, the consequences of excessive alcohol consumption.  These claims do not meet the requirements of 21 U.S.C. 343(r)(6). These claims suggest that this product is intended for use as a drug within the meaning of 21 U.S.C. 321(g)(l)(B), and that it is subject to regulation under the drug provisions of the act.[7]

74.     Even though classification of Chaser® by the FDA as a drug, rather than a dietary supplement, required Bhargava and the Company to meet rigorous substantiation requirements before continuing their claims concerning Chaser®, Defendants simply ignored this admonishment.  Bhargava thereafter trademarked the prohibited phrase "*Freedom from Hangovers®*," for use in connection with the promotion and sale of the Chaser® products while Defendants continued to sell Chaser® as a dietary supplement, continued to make the prohibited claims, and added the following disclaimer to the product packaging:

These statements have not been evaluated by the Food and Drug Administration.  This product is not intended to diagnose, treat, cure, or prevent any disease.

But those statements on the product packaging have been evaluated by the FDA and those statements have been rejected by the FDA.



---

[7]   *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT                                    20

"For wine headaches;"

"To help prevent wine headaches and other discomforts by absorbing harmful elements in wine."

… The statements that you are making for this product, ***including the use of the term "wine headaches" in its name,*** suggest that it is intended to treat or prevent a disease (i.e., adverse consequences, including headaches, associated with alcohol intoxication/poisoning'). These claims do not meet the requirements of 21 U.S.C. 343(r)(6). These claims suggest that this product is intended for use as a drug within the meaning of 21 U.S.C. 321(g)(l)(B), and that it is subject to regulation under the drug provisions of the Act.

Emphasis added.

78. After receiving this second letter from the FDA, Bhargava and the Company continued to sell Chaser® for Wine Headaches with the prohibited claim in the product's name and continued to claim that the product was: "Specially formulated to help prevent headaches and other discomforts by absorbing harmful elements in wine." The product packaging also included the disclaimer that those claims had not been evaluated by the FDA. That disclaimer was false. The statements ***had*** been evaluated by the FDA, which rejected the statements and admonished Bhargava and Living Essentials for making them.



FIRST AMENDED CLASS ACTION COMPLAINT                                          22

### Product 3:  Chaser® Plus

79.     In 2004, Defendants Bhargava and the Company launched their third product, Chaser® Plus, onto the market.  Like the other Chaser® products, the sale of Chaser® Plus is a scam which bears many similarities to the 5-hour ENERGY® hoax.  With Chaser® Plus, Defendants Bhargava and the Company falsely asserted that the effects of certain ingredients in the product are caused by other ingredients, which actually do nothing.  In this instance, however, instead of misattributing the effects of caffeine to the product's B-vitamins and amino acids, Defendants Bhargava and Living Essentials falsely attributed the effects of calcium carbonate and charcoal (vegetable carbon) to homeopathic ingredients[10] in their hangover prevention products.

80.     Homeopathic drugs do not receive the same level of scrutiny by the FDA that other drugs or even dietary supplements receive.[11]     Defendants' scheme,

---

[10]   Homeopathy is a pseudoscience which adheres to the "law of similars" which defies the laws of chemistry and other natural sciences.  *See* http://en.wikipedia.org/wiki/Homeopathy (last accessed August 3, 2011).   "The practice of homeopathy is based on the belief that disease symptoms can be cured by small doses of substances which produce similar symptoms in healthy people." FDA, Compliance Policy Guide Manual § 400.400 Conditions Under Which Homeopathic Drugs May be Marketed (CPG7132.15).   Available at www.fda.gov/ora/compliance_ref/cpg/cpgdrg/cpg400-400.html.  (last accessed on August 3, 2011) (the "CPG").  According to homeopaths, the more that a substance that causes a particular symptom is diluted, the more potent the substance becomes in curing that same symptom.  *Id.*  For instance, Chaser® Plus purports to contain a 30x concentration of zincum met, which is equal to one part zincum met and 1,000,000,000,000,000,000,000,000,000,000 parts water.   Because zincum met purportedly causes fatigue, headaches and nausea, homeopaths believe that the highly diluted solution of zincum met will cure those symptoms in hangover sufferers.

[11]   *See eg.*, *Delarosa v. Boiron, Inc.*, No. 10-cv-1569, 2011 U.S. Dist. LEXIS 80562 (C.D. Cal. July 25, 2011) ("Although homeopathic OTC drugs appear to be treated as a subset of OTC drugs by the FDCA and its various regulations, the way in which they are evaluated and tested by the FDA differs markedly from the ways in which non-homeopathic OTC drugs are evaluated.").  *See also* FDA Warning Letter to Homeopathy for Health, dated June 8, 2010 ("We acknowledge that many

---

1  therefore, served their dual purpose of avoiding FDA scrutiny and claiming to

2  provide a homeopathic alternative to consumers who prefer those products.   But

3  Defendants lied to the FDA and lied to consumers.

4       81.   Chaser® Plus products still include the same active ingredients as

5  Chaser® products, but Chaser® Plus products list calcium carbonate and carbon as

6  "inactive ingredients" on the label.   Defendants then claimed that the same hangover

7  preventing benefits of Chaser® products provided by calcium carbonite and vegetable

8  carbon are now attributable to the magic of homeopathy in Chaser® Plus products.

9      82.   Though calcium carbonate and carbon are present in Chaser® Plus, they

10 apparently no longer "attract and absorb hangover-causing toxins."   Rather, the

11 homeopathic ingredients in Chaser® Plus target the specific symptoms of hangovers.

12 The Chaser® Plus website explained this phenomenon as follows:

13       Chaser® Plus is a homeopathic hangover medicine you take while

14       drinking to help you avoid hangovers. Its ingredients target specific

15       hangover symptoms such as headache, nausea, fatigue, dizziness, light

16       and sound sensitivity, and dry mouth.   It's a safe alternative to aspirin,

17       acetaminophen and other traditional hangover remedies, many of which

18       carry serious alcohol warnings.

19 Formerly located at http://www.chaserplus.com/product.asp (last accessed

20 August 3, 2011).[12]

21

22

23

---

24 homeopathic drug products are manufactured and distributed without FDA approval

25 or authorization under enforcement policies set out in the FDA's Compliance Policy

26 Guide entitled, 'Conditions Under Which Homeopathic Drugs May be Marketed' (CPG 7132.15)").

27 [12]   After this Action was commenced, Defendants removed the Chaser® Plus product

28 website that had been online since 2004.

83. The FDA expressly prohibits this scheme of attempting to insulate drug products from scrutiny by disguising them as homeopathic remedies. Specifically, the FDA notes: "Drug products containing homeopathic ingredients in combination with non-homeopathic active ingredients are not homeopathic drug products."[13]

84. Moreover, even though the FDA has told Bhargava and Living Essentials at least twice, that the use of calcium carbonite and charcoal (vegetable carbon) for the treatment of hangovers requires their hangover relief products to pass rigorous testing in order to substantiate the claim that Chaser® products can provide "Freedom from Hangovers," Defendants continue to make those claims without such substantiation.

85. Whatever effect users of Chaser Plus® may experience from the product's true active ingredients, calcium carbonate and carbon, that effect has nothing to do with the purported homeopathic ingredients in the product.

### Product 4: 5-hour ENERGY®

86. Later in 2004, Defendant Bhargava and the Company launched their fourth product, 5-hour ENERGY®. This time, Defendants employed their entire arsenal of false marketing and advertising tricks to sell the product, including creating

---

[13] See the CPG.

1  distributions from the Company exceeded net income.  Meanwhile, in both 2007 and
2  2008, the Company spent millions of dollars in advertising and brought in millions
3  more from sales of 5-hour ENERGY® products.

4     93.    The Company is dominated by Defendant Bhargava who has used
5  Living Essentials' corporate form to conceal the profits and income derived from his
6  fraudulent practices.

7     94.    In light of Defendant Bhargava's domination of Living Essentials, there
8  is such a unity of interest and ownership between him, Living Essentials and Bio
9  Clinical that their separate personalities no longer exist.  Moreover, failure to
10  disregard the corporate entity would sanction fraud and promote injustice in these
11  circumstances, since Defendant Bhargava may abscond with the proceeds of the
12  fraud, after leaving Living Essentials insolvent and unable to satisfy any judgment
13  that may be obtained in this action.

14                    **CLASS ACTION ALLEGATIONS**

15     95.    Plaintiffs bring this action on behalf of themselves and all other similarly
16  situated persons pursuant to Rule 23 of the *Federal Rules of Civil Procedure*.

17     96.    Plaintiffs seek to represent a Class defined as all persons in the United
18  States who purchased a 5-hour ENERGY® product.  Excluded from the Class are
19  persons or entities that purchased 5-hour ENERGY® products for resale, Defendants
20  and their subsidiaries and affiliates.

21     97.    Plaintiff James seeks to represent a Class defined as all class members
22  who purchased 5-hour ENERGY® 4, 6, or 12-pack Multi-pack products (the "Multi-
23  pack Subclass").

24     98.    Plaintiffs Podobedov and Moussouros seek to represent a subclass
25  defined as all Class members who are New York residents or who purchased 5-hour
26  ENERGY® products within the State of New York (hereafter, the "New York
27  Subclass").

28

99.    Plaintiffs Podobedov and James further seek to represent a subclass defined as all Class members who are California residents or who purchased 5-hour ENERGY® products within the State of California (hereafter, the "California Subclass").

100.    Plaintiffs Podobedov and James further seek to represent a subclass defined as all California Subclass members who purchased a 5-hour ENERGY® energy shot for personal, family or household purposes (hereafter the "California Consumer Subclass").

101.    Members of the Class and Subclasses are so numerous that joinder of all members is impracticable.   While the exact number of Class members is presently unknown, and can only be ascertained through appropriate discovery, Plaintiffs believe the members of the Class exceed hundreds of thousands, if not millions of persons.

102.    Common questions of law and fact exist as to all members of the Class and Subclasses and predominate over any questions solely affecting individual members of the Class and Subclasses.  Among questions of law and fact common to the Class and Subclasses are:

     a.  Whether 5-hour ENERGY® products provide consumers with five hours of energy;

     b.  Whether 5-hour ENERGY®'s ingredients, other than caffeine, provide immediate benefits to consumers' energy level, concentration and focus;

     c.  Whether Defendants expressly and/or impliedly warranted that 5-hour ENERGY® would provide consumers with five hours of energy;

     d.  Whether Defendants expressly and/or impliedly warranted that 5-hour ENERGY®'s ingredients, other than caffeine, provide immediate benefits to consumers' energy level, concentration and focus;

members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously. The interests of Class and Subclass members will be fairly and adequately protected by Plaintiffs and their counsel.

105. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by the individual members of the Class and Subclasses may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class and Subclasses to individually redress the wrongs done to them. There will be no difficulty in the management of this class action.

## COUNT I
## VIOLATION OF MAGNUSUN-MOSS WARRANTY ACT
### (15 U.S.C. § 2301, *et seq.*)

106. Plaintiffs and Class members reallege and incorporate by reference each allegation set forth above and further allege as follows.

107. Plaintiff James brings this Count I individually and on behalf of the members of the Multi-pack Subclass, against all Defendants.

108. 5-hour ENERGY products are consumer products as defined in 15 U.S.C. § 2301(1).

109. Plaintiffs and Class members are consumers as defined in 15 U.S.C. § 2301(3).

110. Defendants are suppliers and warrantors as defined in 15 U.S.C. § 2301(4) and (5).

111. In connection with the sale of 5-hour ENERGY products, Defendants issued written warranties as defined in 15 U.S.C. § 2301(6), which warranted that the

---

products provided 5-hours of energy, B-vitamins for energy and amino acids for focus.

112.   By reason of Defendants' breach of the express written warranties stating that the products provided 5-hours of energy, B-vitamins for energy and amino acids for focus, Defendants violated the statutory rights due Plaintiffs and Class members pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*, thereby damaging Plaintiffs and Class members.

**COUNT II**
**BREACH OF EXPRESS WARRANTY**

113.   Plaintiffs repeat and reallege each and every allegation above, as if set forth in full herein.

114.   Plaintiffs bring this Count II individually and on behalf of the members of the nationwide Class against all Defendants

115.   Defendants expressly warranted in their marketing, advertising and promotion of 5-hour ENERGY® products by representing that those products could provide five hours of energy and an immediate increase in energy, alertness and focus as a result of ingredients other than caffeine.

116.   Plaintiffs and members of the Class purchased 5-hour ENERGY® products based upon the above said express warranty.

117.   Defendants breached their express warranty by selling a product that is not capable of providing five hours of energy or an immediate increase in energy, alertness and focus from ingredients other than caffeine.

118.   As a direct and proximate result of Defendants' breaches of their express warranty, Plaintiffs and members of the Class have been damaged in that they did not receive the product as specifically warranted and/or paid a premium for the product based on the Defendants' misrepresentations.

1

## COUNT III
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

2

3    119.  Plaintiffs repeat and reallege each and every allegation above, as if set

4  forth in full herein.

5    120.  Plaintiffs bring this Count III individually and on behalf of the members

6  of the nationwide Class against all Defendants

7    121.  Defendants impliedly warranted that the 5-hour ENERGY® products

8  they manufactured, sold and distributed could provide five hours of energy and an

9  immediate increase in energy, alertness and focus as a result of ingredients other than

10  caffeine and that the products were merchantable and fit for their intended purpose.

11  Defendants did so with the intent to induce Plaintiffs and members of the Class to

12  purchase those products.

13    122.  Defendants breached their implied warranties in that the products cannot

14  provide five hours of energy and the ingredients other than caffeine do not provide an

15  immediate increase in energy, alertness and focus as marketed, advertised and

16  promoted.

17    123.  Had Plaintiffs and the members of the Class known the true facts, they

18  either would not have purchased the products or would not have been willing to pay

19  the premium price Defendants charged for the products.

20

## COUNT IV
## VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW
### (Bus. & Prof. Code §§ 17200, *et seq.*)

21

22

23    124.  Plaintiffs and Class members hereby reallege and incorporate by

24  reference each allegation set forth above as if fully set forth herein and further allege

25  as follows:

26    125.  This Count IV is asserted by Plaintiffs Podobedov and James on behalf

27  of the California Subclass under California law.

28

---

FIRST AMENDED CLASS ACTION COMPLAINT          32

126. Defendants are subject to the Unfair Competition Law ("UCL"), *Business & Professions Code* §§ 17200, *et seq.* The UCL provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising …."

127. Defendants also violated the "unlawful" prong of the UCL by violating California's *Consumers Legal Remedies Act* ("CLRA") as described in Count VII, below.

128. Defendants also violated the "unlawful" prong of the UCL by violating California's *False Advertising Law* ("FAL") as described in Count VI, below.

129. Defendants' conduct, described herein, violated the "unfair" prong of the UCL by misrepresenting that 5-hour ENERGY® products would provide the user with five hours of energy, by attributing the products effect to ingredients other than caffeine, and by providing false information about the product's performance in clinical studies.

130. Defendants' conduct, described herein, violated the "fraudulent" prong of the UCL by misrepresenting that 5-hour ENERGY® products would provide the user with five hours of energy, by falsely attributing the products effect to ingredients other than caffeine, and by providing false information about the product's performance in clinical studies.

131. Plaintiffs and California Subclass members suffered lost money or property as a result of Defendants' UCL violations because: (a) they would not have purchased 5-hour ENERGY® products on the same terms if the true facts concerning those products had been known; and (b) they paid a price premium due to the false representations about the products.

## COUNT V
## FOR VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW ("FAL")
### (Bus. & Prof. Code §§ 17500 *et seq.)*

132.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

133.   This Count V is asserted by Plaintiffs Podobedov and James on behalf of the California Subclass under California law.

134.   Defendants violated California *Business & Professions Code* § 17500 by publicly disseminating misleading and false advertisements including information suggesting that 5-hour ENERGY® products could provide the user with five hours of energy, the products' effects could be attributed to ingredients other than caffeine, and by providing false information concerning clinical studies purportedly conducted on those products.

135.   Defendants' misleading and false advertisements were disseminated to increase sales of 5-hour ENERGY® products.

136.   Defendants knew or should have known their false advertisements were untrue or misleading.

137.   Furthermore, Defendants publicly disseminated the false advertisements as part of a plan or scheme and with the intent not to sell 5-hour ENERGY® products as advertised.

138.   Plaintiffs and the members of the California Subclass have suffered harm as a result of these violations of the FAL because: (a) they would not have purchased 5-hour ENERGY® products on the same terms if the true facts concerning the products had been known; and (b) 5-hour ENERGY® products did not perform as promised.

139.   Pursuant to *Business & Professions Code* § 17500, Plaintiffs seek an order of this Court permanently enjoining Defendants from continuing to publicly

1  disseminate misleading and false advertisements as alleged herein. Plaintiffs also
2  seek an order requiring Defendants to: (a) make full restitution for all monies
3  wrongfully obtained; and (b) disgorge all ill-gotten revenues and/or profits.

4

**COUNT VI**
**VIOLATION OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT**
**("CLRA")**
**(Civil Code §§ 1750, *et. seq.*)**

5

6

7

8  140. Plaintiffs and Class members hereby reallege and incorporate by
9  reference each allegation set forth above as if fully set forth herein and further allege
10 as follows:

11 141. This Count VI is asserted by Plaintiffs Podobedov and James on behalf
12 of the California Consumer Subclass under California law.

13 142. CLRA § 1770(a)(5) prohibits "[r]epresenting that goods or services have
14 sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which
15 they do not have or that a person has a sponsorship, approval, status, affiliation, or
16 connection which he or she does not have." Defendants violated this provision by
17 misrepresenting that 5-hour ENERGY® products were of a standard that could
18 provide the user with five hours of energy, by falsely attributing the product's effect
19 to ingredients other than caffeine, and by falsely representing the results of clinical
20 testing.

21 143. CLRA § 1770(a)(7) prohibits "[r]epresenting that goods or services are
22 of a particular standard, quality, or grade, or that goods are of a particular style or
23 model, if they are of another." Defendants violated this provision by misrepresenting
24 that 5-hour ENERGY® products were of a standard that could provide the user with
25 five hours of energy, by falsely attributing the product's effect to ingredients other
26 than caffeine, and by falsely representing the product's performance in clinical testing
27 of the products.

28

144. CLRA § 1770(a)(9) prohibits "[a]dvertising goods or services with intent not to sell them as advertised." Defendants violated this provision by misrepresenting that 5-hour ENERGY® products could provide the user with five hours of energy, by falsely attributing the product's effect to ingredients other than caffeine, and by falsely representing the results of clinical testing of the products.

145. Plaintiffs and the California Consumer Subclass members suffered lost money or property as a result of these violations because: (a) they would not have purchased 5-hour ENERGY® products on the same terms if the true facts concerning those products had been known; (b) they paid a price premium due to the false representations about the products; and (c) the products did not perform as promised.

146. On July 21, 2011, prior to the filing of this Complaint, a CLRA notice letter was served on Defendants which complies in all respects with California *Civil Code* § 1782(a). Plaintiffs sent Defendants a letter *via* certified mail, return receipt requested, advising Defendants that they are in violation of the CLRA and must correct, repair, replace or otherwise rectify the goods alleged to be in violation of § 1770. Defendants were further advised that in the event that the relief requested has not been provided within thirty (30) days, Plaintiffs would amend their Complaint to include a request for monetary damages pursuant to the CLRA.

147. Wherefore, such time having elapsed, Plaintiffs seek damages and injunctive relief for violations of the CLRA.

## COUNT VII
## VIOLATION OF THE NEW YORK DECEPTIVE TRADE PRACTICES ACT ("DTPA")
### (New York General Business Law §§ 349, *et seq.*)

148. Plaintiffs repeat and reallege each and every allegation above, as if set forth in full herein.

149. Plaintiffs Podobedov and Moussouros assert this Count VII on behalf of themselves and the New York Subclass.

FIRST AMENDED CLASS ACTION COMPLAINT                    36

150.   Defendants' business practices of marketing, advertising and promoting 5-hour ENERGY® in a misleading, inaccurate, and deceptive manner by misrepresenting that 5-hour ENERGY® provides five hours of energy and by expressly or impliedly attributing the effects of caffeine to the product's other ingredients, constitutes the use by Defendants of unconscionable commercial practices, deception, and misrepresentation and, thus constitutes multiple, separate violations of the *New York Deceptive Trade Practices Act*, § 349, *General Business Law*, *et seq.*

151.   In marketing, advertising and promoting 5-hour ENERGY® products to consumers, including Plaintiffs and members of the New York Subclass, Defendants made the material misrepresentations and omissions set forth in this Complaint throughout the United States, including the State of New York.

152.   Defendants' unlawful conduct set forth in this Complaint is material in that it has the capacity to mislead or deceive consumers, including Plaintiffs and members of the New York Subclass.

153.   Defendants' unconscionable commercial practices, false promises, misrepresentations and omissions set forth in this Complaint are material in that they relate to matters which reasonable persons, including Plaintiffs and members of the New York Subclass, would attach importance to in their purchasing decisions or conduct regarding the purchase of 5-hour ENERGY® products.

154.   As a result of Defendants' practices as described herein, Plaintiffs and members of the New York Subclass have suffered an ascertainable loss of money or property in that: (a) they would not have purchased 5-hour ENERGY® products on the same terms if the true facts concerning those products had been known; (b) they paid a price premium due to the false representations about the products; and (c) the products did not perform as promised.

# **PRAYER FOR RELIEF**

Plaintiffs, on their own behalf and on behalf of the Class, pray for the following relief:

A.    For an order certifying the nationwide Class, the Multi-pack Subclass, the California Subclass, the California Consumer Subclass and the New York Subclass under Rule 23 of the *Federal Rules of Civil Procedure* and naming Plaintiffs as Class Representatives and their attorneys as Class Counsel to represent the Class members;

B.    For an order finding in favor of Plaintiffs, the Class, the California Subclass, the California Consumer Subclass, and the New York Subclass on all counts asserted herein;

C.    For an order awarding compensatory, treble, and punitive damages in amounts to be determined by the Court and/or jury;

D.    For prejudgment interest on all amounts awarded;

E.    For an order of restitution and all other forms of equitable monetary relief;

F.    For injunctive relief as pleaded or as the Court may deem proper; and

G.    For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

/
/
/
/
/
/
/
/

## JURY DEMAND

Plaintiffs demand trial by jury on all issues herein stated.

Dated:    April 13, 2012                    **BURSOR & FISHER, P.A.**

By: _____

L. Timothy Fisher (State Bar No. 191626)
Sarah N. Westcot (State Bar No. 264916)
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone:  (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail:  ltfisher@bursor.com
            swestcot@bursor.com

**BURSOR & FISHER, P.A**
Scott A. Bursor (State Bar No. 276006)
369 Lexington Avenue, 10th Floor
New York, NY 10017
Telephone:  (212) 989-9113
Facsimile:  (212) 989-9163
E-Mail:  scott@bursor.com

**FARUQI & FARUQI, LLP**
Vahn Alexander (State Bar No. 167373)
Christopher B. Hayes (State Bar No. 277000)
1901 Avenue of the Stars, 2nd Floor
Los Angeles, CA 90067
Telephone:  (310) 461-1426
Facsimile:  (310) 461-1427
E-Mail:  valexander@faruqilaw.com
            chayes@faruqilaw.com

**FARUQI & FARUQI, LLP**
Christopher Marlborough (admitted *pro hac vice*)
369 Lexington Avenue, 10th Floor
New York, New York 10017
Telephone:  (212) 983-9330
Facsimile:  (212) 983-9331
E-Mail:  cmarlborough@faruqilaw.com

*Attorneys for Plaintiffs*

I, Richard N. James, declare as follows:

1.      I am a plaintiff in this action and a citizen of the State of California.  I have personal knowledge of the facts herein and, if called as a witness, I could and would testify competently thereto.

2.      In or around November 2009, I purchased 5-hour ENERGY from a Chevron convenience store in Pasadena, California.  The product label claims it provides five hours of energy, B-vitamins for energy and amino acids for focus.  I was lead to believe that 5-hour ENERGY provided a feeling of increased energy from ingredients other than caffeine.  After purchasing the product I discovered that the product did not provide five hours of energy, and any feeling of increased energy was due to the product containing a concentrated dosage of caffeine. The representations made on the product label and in product advertisements were substantial factors influencing my decision to purchase 5-hour ENERGY.  If I had not seen those representations, I would not have purchased 5-hour ENERGY.

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct, executed on August 2, 2011 at Sylmar, California.

_____
Richard N. James



# "5-hour ENERGY® helps me enjoy life even more."

~ *John Ratzenberger, age 63*

Getting older is fine, but not having the energy to do the things I enjoy isn't. That's why I take 5-hour ENERGY.* It gives me hours of energy to keep on doing the things I love to do. What do you love to do? Dancing? Golf? Gardening? Whatever it is, 5-hour ENERGY® can give you the energy you need.*

### There's a lot to like about 5-hour ENERGY®...

- Zero sugar. Four calories.
- It's a nutritional supplement that really works.
- Vitamin B12, vitamin B6, vitamin B3, amino acids and more.
- Caffeine comparable to a cup of the leading premium coffee. Also available in a Decaf version.

*Zero sugar*
*Four calories*





**6-PACK**
**$9.90**

Choose from berry, pomegranate or grape flavors, or our Decaf version.
ONLY $1.65 PER BOTTLE
*Regularly $2.99 per bottle.*
*You save $8!*

### Call 1-877-798-1119
and mention the AARP promo

or visit www.5hourenergy.com/membersonly
Please have your membership number ready.

THESE STATEMENTS HAVE NOT BEEN EVALUATED BY THE FOOD AND DRUG ADMINISTRATION. THIS PRODUCT IS NOT INTENDED TO DIAGNOSE, TREAT, CURE OR PREVENT ANY DISEASE.

The crash means no sugar crash. I have 5-hour ENERGY contains no sugar.

Check with your doctor before taking 5-hour ENERGY if you are taking prescription medicines or have a medical condition.

Provides a feeling of alertness and energy. Does not provide caloric energy that powers important physical performance, electrolyte production etc.

© 2010 Living Essentials, LLC. All rights reserved.

5-hour ENERGY® International:  Select Country/Region:

 



- HOME
- OUR ENERGY SHOTS
- HOW TO USE
- FAQS
- FAN ZONE
- NEWS
- CONTACT US

# 5-HOUR ENERGY®
# INGREDIENTS & SAFETY

In a clinical trial 5-hour ENERGY® significantly outperformed placebo on continuity of attention and self-related awareness. But what's in it? A brief description of each ingredient follows.



## Vitamins

Vitamin B6
Vitamin B12
Niacin (Vitamin B3)
Folic Acid (Vitamin B9)

## Energy Blend

Citicoline
Tyrosine
Phenylalanine
Taurine
Malic Acid
Glucuronolactone
Caffeine

## Safety

Phenylketonurics
Large amounts of vitamins
Niacin flush

### Additional Product Information

- View Ingredient Information
- View Directions for Use
- Myths about 5-hour ENERGY®

 5-hour ENERGY® Store

 5-hour ENERGY® Shot Blog

 5-hour ENERGY® You Tube Page

 5-hour ENERGY® Facebook Page

 5-hour ENERGY® on Twitter

 5-hour ENERGY® My Space Page

## Vitamins

### Vitamin B6

Plays a key role in the production of amino acids, the building blocks of protein. It is used in the creation of DNA. It's involved in over 100 crucial chemical reactions in our bodies. It helps form nearly all new cells in our bodies.

Food sources of vitamin B6 include fortified cereals, beans, meat, poultry, fish, and some fruits and vegetables.

### Vitamin B12

Vitamin B12 is involved in a variety of important functions including the production of amino acids and the processing of carbohydrates into energy.

### Niacin (Vitamin B3)

Niacin is important for energy production. It plays a key role in converting fats, proteins, carbohydrates and starches into usable energy*. Food sources of Niacin include: meat and dairy products, leafy vegetables, broccoli, tomatoes, avocados, nuts and whole grains.

**Folic Acid (Vitamin B9)**

Folic acid, or folate, helps produce and maintain new cells in our bodies. Food sources of folate include leafy green vegetables, fruits, dried beans and peas.

## Energy Blend

**Citicoline**

Citicoline is a water-soluble compound essential for the synthesis of phosphatidyl choline, a constituent of brain tissue. Citicoline plays a role in neurotransmission and can help support brain function.*

**Tyrosine**

An amino acid that transmits nerve impulses to the brain. It is present in meat, dairy, fish and grains.

**Phenylalanine**

An essential amino acid that enhances alertness* It's found in dairy products, avocados, legumes, nuts, leafy vegetables, poultry and fish. Click here to read more about phenylalanine.

**Taurine**

A naturally occurring chemical substance present in meat, fish and dairy products. Adult humans have high concentrations of Taurine in white blood cells, skeletal muscles, the heart and central nervous system. It plays a role in digestion, and is used to process potassium, calcium and sodium in the body, as well as maintain the integrity of cell membranes.*

**Malic Acid**

The body synthesizes Malic Acid during the process of converting carbohydrates to energy. The main food source of Malic Acid are fruits, especially apples, which contain the highest concentrations.

**Glucuronolactone**

A natural metabolite found in the human body. It is produced by the metabolization of glucose in the liver. It has been shown to reduce sleepiness*.

**Caffeine**

Provides a boost of energy and feeling of heightened alertness.* Original 5-hour ENERGY® contains caffeine comparable to a cup of the leading premium coffee. Extra Strength 5-hour ENERGY® contains caffeine comparable to 12 ounces of the leading premium coffee. Decaf 5-hour ENERGY® contains about as much caffeine as a half cup of decaffeinated coffee.

## Safety

**Phenylketonurics**

Phenylketonurics: Contains phenylalanine.
NOTE: 5-hour ENERGY® does not contain aspartame. This warning is for people with the genetic disorder, phenylketonuria only.

**Large amounts of vitamins**

The vitamin levels in 5-hour ENERGY® are well within safe limits. The Recommended Daily Allowance in the minimum daily amount set by the Food and Nutrition Board of the Institute of Medicine.

**Niacin flush**

A small percentage of people are sensitive to Niacin (Vitamin B3) and may experience a "Niacin Flush" (hot prickly feeling, skin redness) that lasts a few minutes. This is caused by Niacin increasing blood flow near the skin. This can be avoided by taking half a bottle or less at a time.

Directions for Use and Label Information



**Code 12:**
Ingredients

5-hour ENERGY® Shots | New 5-hour ENERGY® Flavors | Original Shot | Decaf | Extra Strength | How To Use | FAQ | Fan Zone | The Energy Inquirer | Contests | Energy Shot Blog | Find a Store | Ingredients | Articles | News | Contact Us | Site Map | Home

Contains caffeine. Click here for more information.
No crash means no sugar crash. 5-hour ENERGY® contains no sugar.

©2011 Living Essentials

*This statement has not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease.

Individual results may vary.

Original 5-hour ENERGY® contains caffeine equivalent to a cup of the leading premium coffee. Extra Strength 5-hour ENERGY® contains caffeine equivalent to 12 ounces of the leading premium coffee. Limit caffeine products to avoid nervousness, sleeplessness and occasional rapid heartbeat. Decaf 5-hour ENERGY® contains about as much caffeine as a half cup of decaffeinated coffee.

**DEPARTMENT OF HEALTH & HUMAN SERVICES**      Public Health Service

Food and Drug Administration
Washington, DC 20204

1 0 4 3   '01   APR 13  P3:21

MAR 30 2001

Mr. Manoj Bhargava
Living Essentials
3141 Old Farm Lane
Walled Lake, Michigan 48390

Dear Mr. Bhargava:

This is in response to your letter of February 28, 2001 to the Food and Drug
Administration (FDA) pursuant to 21 U.S.C. 343(r)(6) (section 403(r)(6) of the Federal
Food, Drug, and Cosmetic Act (the Act)). Your submission states that Living Essentials
is making the following claims for the product **Chaser:**

> "Helps prevent hangovers"
> "Helps prevent hangovers by absorbing elements in beer, wine and liquor that
> cause hangovers."

21 U.S.C. 343(r)(6) makes clear that a statement included in labeling under the authority
of that section may not claim to diagnose, mitigate, treat, cure, or prevent a specific
disease or class of diseases. The statements that you are making for this product suggests
that it is intended to treat, prevent, mitigate a disease, namely, the consequences of
excessive alcohol consumption. These claims do not meet the requirements of 21 U.S.C.
343(r)(6). These claims suggest that this product is intended for use as a drug within the
meaning of 21 U.S.C. 321(g)(l)(B), and that it is subject to regulation under the drug
provisions of the act. If you intend to make a claim of this nature, you should contact
FDA's Center for Drug Evaluation and Research (CDER), Office of Compliance, HFD-
3 10, 7520 Standish Place, Rockville, Maryland 20855.

97S 0163     LET 481

Page 2 – Mr. Manoj Bhargava

Please contact us if we may be of further assistance.

Sincerely yours,

*for* John B. Foret
Director
Division of Compliance and Enforcement
Office of Nutritional Products, Labeling
    and Dietary Supplements
Center for Food Safety
    and Applied Nutrition

Copies:
FDA, Center for Drug Evaluation and Research, Office of Compliance, HFD-300
FDA, Office of the Associate Commissioner for Regulatory Affairs, Office of
Enforcement, HFC-200
FDA, Chicago District Office, Office of Compliance, HFR-MW140

Page 3 - Mr. Manoj Bhargava

cc:
HFA-224
HFA-305 (docket 97S-0163)
HFS-22 (CCO)
HFS-800 (file, r/f)
HFS-810 (Foret)
HFS-811 (Moore, w/original incoming)
HFD-40 (Behrman)
HFD-310
HFD-3 14 (Aronson)
HFS-607 (Bayne-Lisby)
HFV-228 (Benz)
GCF- 1 (Nickerson)
r/d:HFS-81 1:RMoore:3/27/01
docname:74841.adv:disc55

# Living Essentials

7484l

February 28, 2001

Christine J. Lewis, Ph.D.
Office of Nutritional Products, Labeling and Dietary Supplements
Center for Food Safety and Applied Nutrition
Food and Drug Administration
200 C Street, S.W.
Washington, DC 20204

Dear Dr. Lewis,

We are sending you this letter in accordance with 21 CFR § 101.93(a)(l). Living Essentials, located at 3141 Old Farm Lane, Walled Lake, MI 48390 expects to distribute its dietary supplement product, tradenamed "Chaser," with the following statements:

(1)     "Helps prevent hangovers"

(2)     "Helps prevent hangovers by absorbing elements in beer, wine and liquor that cause hangovers."

The product contains vegetable carbon and activated calcium carbonate.

I hereby certify that this information is complete and accurate. Our firm has substantiation that the statements are truthful and not misleading.

Sincerely,

Manoj Bhargava

Manoj Bhargava

3141 Old Farm Lane, Walled Lake, MI 48390
Voice: (248) 960-1700   Fax: (248) 960-1980

**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Public Health Service

_____

Food and Drug Administration
College Park, MD  20740

OCT 30 2002

Manoj Bhargava
Living Essentials
3141 Old Farm Lane
Walled Lake, Michigan  48390

Dear Mr./Ms. Bhargava:

This is in response to your letter of October 4, 2002 to the Food and Drug
Administration (FDA) pursuant to 21 U.S.C. 343(r)(6) (section 403(r)(6) of the
Federal Food, Drug, and Cosmetic Act (the Act)).  Your submission states that
Living Essentials is making the following claims, among others, for the product
**Chaser for Wine Headaches**:

> "For wine headaches;"
> "To help prevent wine headaches and other discomforts by absorbing harmful
> elements in wine."

21 U.S.C. 343(r)(6) makes clear that a statement included in labeling under the
authority of that section may not claim to diagnose, mitigate, treat, cure, or prevent a
specific disease or class of diseases.  The statements that you are making for this
product, including the use of the term "wine headaches" in its name, suggest that it is
intended to treat or prevent a disease (i.e., adverse consequences, including
headaches, associated with alcohol intoxication/poisoning[1]).  These claims do not
meet the requirements of 21 U.S.C. 343(r)(6).  These claims suggest that this product
is intended for use as a drug within the meaning of 21 U.S.C. 321(g)(1)(B), and that
it is subject to regulation under the drug provisions of the Act.  If you intend to make
claims of this nature, you should contact FDA's Center for Drug Evaluation and
Research (CDER), Office of Compliance, HFD-310, 7520 Standish Place, Rockville,
Maryland 20855.

_____

[1] In the January 6, 2000 final rule on structure/function claims (65 FR 1000 at 1015), FDA discussed
the basis for its conclusion that alcohol intoxication, like all poisonings, meets the definition of
disease.

973 - 0163                                                        LET651

Page 2 - Manoj Bhargava

Please contact us if we may be of further assistance.

Sincerely yours,

John B. Foret
Director
Division of Compliance and Enforcement
Office of Nutritional Products, Labeling
    and Dietary Supplements
Center for Food Safety
    and Applied Nutrition

Copies:
FDA, Center for Drug Evaluation and Research, Office of Compliance, HFD-300
FDA, Office of the Associate Commissioner for Regulatory Affairs, Office of
Enforcement, HFC-200
FDA, Detroit District Office, Office of Compliance, HFR-MW240

**living essentials**

3141 Old Farm Lane • Walled Lake, MI 48390 • 248-960-1700 • Fax 248-960-1980

October 4, 2002

OCT 2 1 2002

Christine Lewis Taylor, Ph.D
Office of Nutritional Products, Labeling and Dietary Supplements (HFS 810)
Center for Food Safety and Applied Nutrition
Food and Drug Administration
5100 Paint Branch Pkwy.
College Park, MD 20740

Dear Dr. Taylor:

We are sending you this letter in accordance with 21 CFR § 101.93(a)(1). Living Essentials, located at 3141 Old Farm Lane, Walled Lake, MI 48390 expects to distribute its dietary supplement product, tradenamed "Chaser for Wine Headaches," with the following statements:

(1) "For wine headaches"
(2) "To help prevent wine headaches and other discomforts by absorbing harmful elements in wine"

The product contains activated calcium carbonate and vegetable carbon.

I hereby certify that, to the best of my knowledge, this information is complete and accurate, and that our firm has information suggesting that the statements are truthful and not misleading.

Sincerely,

Manoj Bhargava

Manoj Bhargava

$ 2295

**PROOF OF SERVICE**

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is Bursor & Fisher, P.A., 1990 North California Blvd, Suite 940, Walnut Creek, California 94596.  On April 13, 2012, I served the within documents:

**FIRST AMENDED CLASS ACTION COMPLAINT**

☐  by placing a copy of the document(s) listed above for collection and mailing following the firm's ordinary business practice in a sealed envelope with postage thereon fully prepaid for deposit in the United States mail at Walnut Creek, California addressed as set forth below.

☒  by depositing a true copy of the same enclosed in a sealed envelope with delivery fees provided for a Overnight/Federal Express pick up box or office designated for overnight delivery, and addressed as set forth below.

☐  By causing a personal delivery of a copy of the document(s) listed above to the person(s) at the address(es) set forth below.

☐  by facsimile transmission on that date. This document was transmitted by using a Brother MFC-846ON facsimile machine that complies with California Rules of Court Rule 2003(3), telephone number (925) 407-2700.  The transmission was reported as complete and without error.

☐  by e-mail transmission on that date.  These documents were transmitted via e-mail to the following e-mail addresses as set forth below.

Gerald E. Hawxhurst, Esq.
Crone Hawxhurst LLP
10880 Wilshire Boulevard, Suite 1150
Los Angeles, CA  90024
Telephone:  310-893-5150
Facsimile:   310-893-5195
Email:  jerry@cronehawxhurst.com

I declare under penalty of perjury under the laws of the State of California that the above is true and correct, executed on April 13, 2012, at Walnut Creek, California.

_Debbie Schroeder_
Debbie Schroeder